631 A.2d 110

**Gregory Mung Sen TU**

v.

**STATE of Maryland.**

**No. 982, Sept. Term, 1992.**

Court of Special Appeals of Maryland.

Sept. 29, 1993.

Gary S. Offutt, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Kathryn Grill Graeff, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Andrew L. Sonner, State's Atty. for Montgomery County, Rockville, on the brief), for appellee.

Submitted before WILNER, C.J., and BISHOP, and ALPERT, JJ.

WILNER, Chief Judge.

This is appellant's second trip to this Court. In November, 1989, he was convicted by a jury in the Circuit Court for Montgomery County of the first degree murder of his wife, Lisa Tu, for which he was sentenced to life imprisonment. In 1990, we reversed that judgment and remanded the case for a new trial because we concluded, based on the evidence presented at a suppression hearing prior to the trial, that a briefcase containing incriminating evidence later used at the trial had been unlawfully seized from appellant's motel room in Las Vegas. *Tu v. State*, No. 120, Sept. Term, 1990 (filed Nov. 19, 1990).

On remand, a new suppression hearing was held with respect to the briefcase and its contents, at which new and

different evidence was presented regarding the seizure. On that evidence, the court again denied the motion to suppress. Appellant was retried and the challenged evidence was admitted, but this time appellant was acquitted of first degree murder, convicted only of second degree murder, and sentenced to 30 years imprisonment. From the judgment entered on that conviction, appellant has brought this appeal asking:

"I.   Did the trial court err when it held that evidence this Court previously held to be inadmissible could be admitted into evidence?

II.   Did the trial court err when it permitted testimony that certain telephone numbers shown to have been called by Appellant were to prostitutes and adult entertainment agencies?

III.   Did the trial court err when it admitted evidence respecting blood spattering and blowback in a case in which the State conceded there was no evidence as to how the alleged murder was committed?

IV.   Did the trial court err in admitting hearsay evidence regarding the responses an investigating officer received to his inquiries about the case?

V.   Did the trial court err when it refused defense counsel's request for a dual inferences instruction?"

We shall affirm.

## I.   UNDERLYING FACTS

As we indicated, appellant was charged with murdering his wife, Lisa, to whom he had been married for about 10 years. This was not a routine prosecution, for there were no witnesses to the alleged murder and Lisa's body was never found. The State posited that appellant had hidden the body in a couch on which Lisa normally slept during the summer months and then had the couch hauled to a county landfill where it was so compacted with tons of other trash that, by the time the police went to search for it, it was impossible to find.

The State attempted to prove that Lisa had been murdered by showing, first, her sudden and unexplained disappearance on July 12 or 13, 1988. It offered evidence from her friends and relatives that all communication with Lisa ceased as of then, as did financial transactions on her bank accounts and credit cards. The State also showed that blood found in the basement of her home and on the covering of the couch on which she slept was, with a high degree of probability, that of Lisa or a close relative of Lisa's. Appellant's criminal agency rested on (1) evidence of appellant's financial difficulties, an insurance policy on Lisa's life under which appellant was the beneficiary, deterioration of the relationship between appellant and Lisa, and appellant's awareness that Lisa was having an affair with another man, all of which went to establish motive; (2) the presence in the house of two knives and appellant's purchase of at least one handgun, tending to show ability; (3) evidence that, on July 16, appellant arranged for a trash collector to haul away the couch notwithstanding that its condition did not warrant destruction; and (4) appellant's conduct after Lisa's disappearance.

Shortly after Lisa's disappearance, appellant told relatives that she had flown to California to visit a sick friend. That friend testified, however, that she had not been sick, that she had not invited Lisa to visit, and that Lisa did not, in fact, visit her after July 12. After appellant learned that he was a suspect, he flew to Taiwan, returned to Maryland briefly for questioning, then flew to Las Vegas, where, despite telling friends here that he was looking for Lisa, he sought employment, gambled, and made telephone calls to two adult entertainment agencies and a prostitute.

The defense sought to show that Lisa had indeed gone to California. Appellant produced from United Airlines records evidence that a ticket had been issued in the name of L.L. Tu for a flight on July 14, 1988, from Dulles Airport to Los Angeles and then to San Francisco. The airline record was marked in a way indicating that the ticket had been used from Dulles to Los Angeles. Appellant also presented the testimony of a United Airlines customer service representative, Nan-

cy Mulcahy, who recalled telling a detective in August, 1988, that she saw a woman resembling Lisa board an aircraft for Los Angeles in mid-July of that year. The State responded with testimony from the three passengers on the July 14 flight whose seats were adjacent to the seat to which the ticket related that the seat had been empty. There was also other evidence that Ms. Mulcahy may have been mistaken.

## II.  DISCUSSION

### Suppression of Briefcase And Contents

Evidence presented at the first suppression hearing indicated that, following the issuance of a fugitive warrant, appellant was arrested in Las Vegas on September 10, 1988. Two Montgomery County detectives, when apprised of the arrest, flew to Las Vegas where, in cooperation with the local police, they obtained a search warrant for appellant's motel room. The warrant authorized the search for and seizure of seven categories of items. The application and the warrant were placed into evidence. In executing the warrant, the police seized the briefcase, which contained various documents and tangible items that did not fall within any of the categories enumerated in the warrant. No evidence was presented by the State as to where the briefcase was located in the motel room or as to the circumstances of its seizure.

Faced with the argument that the briefcase and at least some of its contents were not within the authority of the warrant, the State argued that seizure was permissible under the "plain view" doctrine. We rejected that argument because of the lack of any evidence to sustain it. There was nothing to show that the briefcase or its contents were, in fact, in plain view or that they were immediately recognizable as incriminating. As a result, we reversed the judgment and remanded for a new trial.

On remand, the State shifted course. Detective Turner, of the Montgomery County police department, said that he had been mistaken in his earlier testimony that the disputed items had been seized in the execution of the search warrant. He

testified that he and Detective Thomson went to Las Vegas when informed of appellant's arrest, that appellant gave him permission to search the motel room, and that the warrant was obtained merely "out of an abundance of caution." In the course of the search, he discovered a laundry receipt hanging in an open closet. Turner said that he seized the item because he believed that it fell within the warrant categories. The other disputed items, he said, had not been seized from the motel room as he had earlier testified but rather had been taken from appellant by the local police at the time of his arrest. Detective Turner said he was given the various items at the Las Vegas County jail in a packet. He identified a Xerox copy of a Las Vegas Metropolitan Police Department Inmate's Property Inventory and Release and copies of other of the disputed documents. He said that the copies were made at the Las Vegas jail, and it was upon reviewing them that he realized that he had received the items from the local police and not from the motel room.[1]

Detective Thomson corroborated Turner's current testimony. He said that, except for the laundry ticket, which was found in the motel room closet, the other items were in an envelope maintained by the local police at the jail. He specifically denied that they had been found in the motel room. The court obviously credited that evidence and found the disputed items, as well as the testimony and evidence derived from them, to be admissible.

Appellant makes two complaints about the court's ruling. First, he urges that he is entitled to some kind of relief because, in contravention of Md. Rule 4–252(f), the court omitted to state its findings on the record. Second, he complains that, under the "law of the case" doctrine, the court

---

1. Turner's exact testimony on this point was as follows:
   "I looked at the photocopies and saw that the Silver Dragon card was photocopied, saw that the greeting card was photocopied, and some other things were photocopied as well, which led me to believe that my testimony initially had been an error, and these items were in fact from [appellant's] personal property as opposed to being from the proceeds from the search warrant at the El Rancho Motel."

was bound by the earlier ruling of this Court that the items in question were not admissible, and that it was not permissible for the State to relitigate that issue. Neither complaint has any merit.

Md. Rule 4–252 deals with pre-trial motions, such as motions to suppress evidence. Section (f) requires that those motions ordinarily be decided prior to trial and states, in its concluding sentence, that "[i]f factual issues are involved in determining the motion, the court shall state its findings on the record." At the conclusion of the hearing, the court stated simply that "the State's position prevails in this case, and the items as requested will be received at trial." No further explanation was given, which is the point of appellant's first complaint.

The problem with appellant's position is that there really were no factual issues to be resolved. The only evidence presented was by Detectives Turner and Thomson, who testified as indicated. There was no controverting evidence. The court could accept the current testimony and the fact that Detective Turner had been mistaken in his earlier statement, which was the State's position, or not accept it. If the court did not believe the revised explanation, it would indeed have been bound by our earlier ruling and required to suppress the evidence. But if it chose to credit the new explanation, then, in the absence of any countervailing evidence, there would be no reason to suppress the evidence. The court's brief remark—that the State's position prevails—suffices, under these circumstances, as a statement of its finding.

Appellant's second argument is that our earlier conclusion that the evidence was inadmissible bars any relitigation of that issue in that it became the "law of the case." That argument takes a far too global and far too simplistic view of the "law of the case" doctrine. To be sure, the doctrine has occasionally been stated in very broad terms. In *Chayt v. Board of Zoning Appeals,* 178 Md. 400, 403, 13 A.2d 614 (1940), for example, the Court, quoting from *Waters v. Waters,* 28 Md. 11, 22 (1867), declared that its decision "once pro-

nounced in any case is binding upon the court below ... and cannot be disregarded or called in question. It is the law of the case binding and conclusive upon the parties, not open to question or examination afterwards in the same case." *See also Fid–Balto. Bank v. John Hancock,* 217 Md. 367, 142 A.2d 796 (1958); *Loveday v. State,* 296 Md. 226, 462 A.2d 58 (1983). In other cases, however, the Court has made clear that the doctrine applies only where the facts upon which the first appellate decision was premised are substantially the same as those produced upon remand.

This caveat was clearly enunciated at least as early as *Frisby v. Parkhurst,* 29 Md. 58 (1868), a dispute over the proceeds from the sale of property which depended, in part, on whether the decedent, Elizabeth Frisby, owned the property in fee or had only a life estate. Under the will of her father, the property was devised to Ms. Frisby's mother for life, with the remainder to Ms. Frisby. Under the mother's will, however, the property was devised to Ms. Frisby for life, with a remainder to Ms. Frisby's son. Regrettably, Ms. Frisby contracted a number of debts, and, upon her death, her creditors and her son made conflicting claims on the property. The principal issue in the first proceeding was whether Ms. Frisby had elected to take the property under the will of her mother instead of under the will of her father, in which event she would have a life estate only, but the pleadings also raised the question of whether, apart from any formal election, she took the life estate pursuant to an agreement with her mother. In the first appeal, from an interlocutory injunction pending a final hearing, the Court of Appeals held that no election had been made and that there was insufficient evidence to show an agreement; it affirmed the injunction and remanded the case for further proceedings. On remand, further pleadings were filed and more evidence was produced tending to establish an agreement between Ms. Frisby and her mother. Nonetheless, the trial court, believing itself bound by the conclusions announced in the first appeal, concluded that Ms. Frisby had the fee simple estate and distributed the property to her creditors.

In the second appeal, the Court of Appeals reversed. Rejecting the appellees' argument that the trial court was bound by the Court's earlier decision that there was no agreement, the Court observed:

> "It has been urged that the decision upon the former appeal has settled the questions which the present appeal presents for consideration of the Court, and is conclusive upon the parties and the Court. It is perfectly clear that, if the same questions are presented upon this appeal as upon the former, *and upon the same state of facts,* the former decision must stand as the law of this case and the parties and this Court must be bound by it."

29 Md. at 65 (emphasis added).

In that regard, the Court noted that, in the first appeal, the evidence regarding an agreement between Ms. Frisby and her mother was uncertain, ambiguous, and liable to misconstruction. Much clearer evidence was presented on remand. Accounting for that, the Court held:

> "The state of facts, thus presented, is very different from the proof upon the former appeal, and it is admitted by the counsel for the appellees that the evidence must be the same to make the decision upon the former appeal binding this. This view of the case is also sanctioned by *State vs. Reigart,* 1 Gill, [1] 27."

*Id.* at 67.

A similar view was taken in *Diggs v. Smith,* 130 Md. 101, 99 A. 952 (1917), although in that case, the Court did not find the evidence presented on remand sufficiently different to warrant a different result. The case is significant in that, unlike *Frisby,* the first appeal was not from an interlocutory order but from a final judgment. The issue was whether a will was procured by fraud; a jury found that it was and the caveatee appealed, arguing that the evidence was insufficient to sustain that verdict. The Court of Appeals agreed, holding that the jury should have been instructed that there was no legally sufficient evidence from which it could find that the will was procured by fraud. It nonetheless remanded for a new trial.

*Smith v. Diggs*, 128 Md. 394, 97 A. 712 (1916). On remand, new evidence was presented, but the trial court withdrew the case from the jury, finding insufficient evidence that the will was procured by fraud. In the second appeal, the Court noted that its decision in the first appeal "fully settled the law of the case, *so far as the facts then presented were concerned*" and held that "[a]ll that is necessary upon this appeal is to consider to what extent additional testimony adduced at the second trial should operate to modify the conclusion then reached." 130 Md. at 102, 99 A. 952 (emphasis added). *See also Maryland Coal Co. v. Baker*, 85 Md. 688, 689, 36 A. 768 (1897).

This principle, applied in these older Maryland cases, is well established nationally. The "law of the case" doctrine does not preclude reconsideration of an issue decided in an earlier appeal if the evidence on remand is substantially different. *See Milgard Tempering, Inc. v. Selas Corp. of America*, 902 F.2d 703 (9th Cir.1990); *J.E.T.S., Inc. v. U.S.*, 838 F.2d 1196 (Fed.Cir.), *cert. denied*, 486 U.S. 1057, 108 S.Ct. 2825, 100 L.Ed.2d 926 (1988); *Sanders v. Sullivan*, 900 F.2d 601 (2d Cir.1990); *Coty v. Ramsey Associates, Inc.*, 154 Vt. 168, 573 A.2d 694 (1990); *Harrison v. Dorsey*, 184 Ga.App. 870, 363 S.E.2d 151 (1987), *cert. denied*, 184 Ga.App. 870, 363 S.E.2d 151 (1988); *Bismarck Hotel Co. v. Sutherland*, 175 Ill.App.3d 739, 125 Ill.Dec. 15, 529 N.E.2d 1091, *cert. denied*, 124 Ill.2d 553, 129 Ill.Dec. 147, 535 N.E.2d 912 (1988); *Steen v. Colombo*, 799 S.W.2d 169 (Mo.Ct.App.1990).

A case very close in point is *State v. Grosvenor*, 402 N.W.2d 402 (Iowa 1987). Pursuant to a search warrant, police found contraband in a hall closet outside the defendant's room. The police also found $877 in the defendant's wallet, including certain marked bills that had earlier been given to an informant to make a controlled buy. In the first appeal, the Iowa appellate court concluded that the warrant was valid only for the common areas of the residence and not for the defendant's room. In the belief, based on testimony at the first trial, that the wallet had been found in the defendant's room, the Court held that the money should have been suppressed along with

the other evidence found in the room. On retrial, the police clarified that the wallet was taken from the defendant upon his arrest outside the house, and, based on that evidence, the trial court ruled the money admissible. In a second appeal, the defendant argued, as appellant does here, that the trial court was bound by the prior appellate ruling that the evidence was inadmissible. Rejecting that argument, the Iowa Supreme Court held that the law of the case doctrine is not applicable "if the facts before the court upon the second trial are materially different from those appearing upon the first." *Id.* at 405. The State, it said, was not attempting to relitigate the issue resolved in the first appeal but to show, through additional and different evidence, that the facts were not as assumed by the appellate court in the first appeal.

The earlier conclusion of this Court that the items in question were inadmissible was based on the assumption that they were found inside the briefcase which, in turn, was discovered in the motel room. They were declared inadmissible because seizure of the briefcase was not within the scope of the warrant and there was no evidence to support the seizure under the "plain view" doctrine. We did not declare the items to be inherently and generically inadmissible but merely inadmissible upon the circumstances presented to us in that case. The record before us now is quite different. We find no error in the admission of the disputed items.

### The Telephone Calls

Largely through the testimony of a Las Vegas detective and a criss-cross telephone directory, the State produced evidence of certain telephone calls made from appellant's motel room in Las Vegas. Two of the calls were made to what the detective said were adult entertainment agencies; another was made to a woman named Lisa Coleman, who the detective said was a prostitute. Appellant complains that this evidence was (1) irrelevant, (2) inadmissible as showing prior bad acts or other crimes, and (3) unduly prejudicial. The testimony that Ms. Coleman was a prostitute, he argues, also constituted inadmissible hearsay. We find no merit in any of these assertions.

As we indicated, shortly after Lisa's disappearance, appellant told friends that she had gone to California to visit a friend. He also said that he was going to Los Angeles to look for her and that, if he could not find her there, he would search for her in San Francisco. Instead, he went to Las Vegas. The State sought to show that his purpose in traveling to Las Vegas was not to search for Lisa but rather to seek employment, to gamble, and to engage in more hedonistic pursuits. The relevance of this evidence is obvious; it impeached both his explanation and his credibility.

We know of no law, and none has been cited to us, making it a criminal act to call either an adult entertainment agency or a woman who happens to be a prostitute. The evidence in question, therefore, did not constitute "other crimes" evidence. Whether such calls could even qualify as prior "bad acts" is at best marginal, but, assuming that they could, the evidence did have independent relevance, as just noted, and would therefore not be inherently inadmissible. The evidence was not offered to show that appellant was a bad or immoral person but rather to disprove appellant's explanation of Lisa's disappearance. Given the circumstantial nature of the State's case, the evidence was probative, and we cannot say that its probative value was outweighed by any prejudice to appellant.

With respect to Ms. Coleman, the detective said that the number shown to him was a pager number, that he called that number and left a message, and that Ms. Coleman later returned the call. He said that, based on further research that he did, he learned that she was an active prostitute in Las Vegas. That response, says appellant, was probably hearsay and not based on the detective's personal knowledge. The problem is that we don't know whether that was so because the detective was never asked. His research could have included personal contact with Ms. Coleman or could have been based on public records or business records of the police department. On this record, we are unwilling to accept as fact that which appellant merely assumes.

### Blood Spattering and Blowback Evidence

The State produced evidence that, shortly after July 13, appellant disposed of a couch that had been located in the basement of his home, on which Lisa normally slept during the summer. The police discovered hidden in the house a couch covering that had blood stains on it. Also observed were drops of blood on other furniture in the basement located a few feet from where the missing couch had been. As indicated, there was evidence that the blood likely was Lisa's.

The subject of appellant's present complaint is testimony by Detective Roger Thomson intended to show that the spattering of the blood was consistent with Lisa having been shot while on the missing couch. Thomson had been on the county police force for 19 years and a "death investigator" for 11 years. He had a master's degree in criminal justice and had taken courses in forensic science and death investigation. He had been to over 100 crime scenes where gun shots were involved. Based on that training and experience, he said he was familiar with the concept of "blowback," which he described as a phenomenon occurring when a person is shot. The skin is elastic, and, after a projectile penetrates it, blood and other tissue spray out of the wound in the direction of the source of the projectile, *i.e.*, in a direction opposite to that of the projectile itself. The blood deposits he observed in the basement of appellant's home, he said, were typical of "blowback."

Appellant makes three complaints about this evidence. He claims that it was irrelevant because there was no direct evidence as to the cause of Lisa's death, or even whether she was dead; he asserts that Detective Thomson lacked a foundation to give an expert opinion; and he complains that the evidence violated an earlier representation by the State that Detective Thomson would not be offering "blowback" evidence.

We have no difficulty at all with any of these complaints. The evidence was clearly relevant, for it tended to establish that Lisa was indeed shot while in the basement of

appellant's home. Moreover, based on the detective's training and experience, we cannot conclude that the trial court abused its discretion in permitting him to express his opinion. Police officers are permitted to express opinions, whether regarded as expert or non-expert, based on their training and experience, and surely the information he gave was not of common knowledge and would be helpful to the jury. *See Yeagy v. State,* 63 Md.App. 1, 491 A.2d 1199 (1985).

We also reject appellant's complaint that he was misled by the State. Detective Thomson apparently opined at appellant's first trial in 1989 that the blood stains were the product of "blowback," although his testimony in that case is not included in the record now before us. It seems clear, in any event, that the defense was aware of Detective Thomson's opinion in that regard. On April 22, 1992—the seventh day of the second trial—the question arose as to the nature of the detective's proposed testimony. The next morning, the prosecutor informed the court that he had advised defense counsel in writing "several weeks ago" that the detective would testify about blowback consistently with his testimony in the first trial. He said that the officer would explain the concept and talk about the distances that blood could travel, based on his experience. The prosecutor did acknowledge, however, in response to the court's question, that he would not elicit anything from the detective "relative to an application of blow back to this case." That is the representation seized upon by appellant.

Immediately after this conversation, Detective Thomson took the stand, gave his qualifications, and began testifying about his observations in the basement and the concept of blowback. It could not have been more than a few minutes later that he was asked, and, over objection, opined that the deposits he observed were typical of blowback. Appellant cries foul, claiming that he was misled to his great detriment. He complains that the court erred in failing to grant his motion for mistrial.

The State's lame argument to the contrary notwithstanding, it seems clear to us that the challenged testimony was "relative to an application of the blow back to this case" and thus accomplished what the prosecutor had said would not be done. We fail to see, however, how appellant was unfairly prejudiced. The testimony, as we have held, was relevant and competent, and was therefore admissible. Appellant was on notice, until just minutes before, that such testimony was likely. Certainly, he could not have reasonably constructed his defense on the assumption that such testimony would not be forthcoming. To the extent he was misled, it was only for a few moments, all during the State's case. We find no reversible error.

**Evidence Relating To Airport Personnel**

Detective Turner, who had earlier testified as a State's witness, was also called as a witness for the defense. On direct examination, he stated that, as part of the initial investigation, a Detective Mathers had gone to Dulles Airport, interviewed an airline customer relations agent named Nancy Mulcahy, and reported that she recalled seeing a woman looking like Lisa Tu board "the plane." Turner did not recall ever seeing a written statement from Ms. Mulcahy. Counsel asked when the next time was that the police attempted to contact Ms. Mulcahy, and Turner responded that it was a year or so later.

On cross-examination, Detective Turner stated that the information he had received with respect to Ms. Mulcahy was that the woman she remembered was assisted by skycaps. Over objection, he was permitted to state that he had then gone to the airport and interviewed all seven skycaps who were working at the time in question, showed them a picture of Lisa, and that none of them identified her. He was also permitted to testify that he had sent a picture of Lisa to the entire flight crew with a request that they contact him if anyone recalled seeing her on the flight and that he got no response. Finally, he was allowed to say that he had contacted the three people who occupied the seats next to the one

that Lisa was supposed to have occupied; all of them said that "Lisa's" seat was empty.

Appellant acknowledges that this testimony was relevant to show that the investigation was thorough but complains that it was nonetheless inadmissible because it was hearsay. If offered for its truth, appellant would be correct. But that was not its purpose. Immediately after conducting this part of the cross-examination, the prosecutor asked: "So the fact of the matter is the reason you never went back to talk to Mrs. Mulcahy is every single thing that she told you proved not to be true, isn't that correct," to which the detective responded in the affirmative. The court itself recognized that limited purpose when counsel first specified that his objection was based on hearsay. The fact is that appellant sought to show that the police did not make a sufficient investigation or take proper account of Ms. Mulcahy's statement, and this evidence was intended to establish that the police did indeed take account of her statement and investigated it thoroughly. The relevance of the negative responses Detective Turner received was not that the responses were necessarily accurate but that, uniformly, they did not support Ms. Mulcahy's recollection.

Proof of a negative is difficult. The courts of several jurisdictions have held that, where a witness conducts a fruitless investigation, the witness's testimony as to the responses he received would be hearsay if offered for the truth of the responses but not if offered as proof of the thoroughness of the investigation.

In *United States v. Blandina,* 895 F.2d 293 (7th Cir.1989), IRS agents interviewed 61 coin dealers in Chicago and Bloomington, Indiana, in an effort to check Blandina's story that he had sold a valuable coin collection to dealers in Bloomington and Chicago. All the coin dealers spoken to were asked whether they had purchased coins from Blandina; all said that they had not. At trial, the IRS agent was permitted, over objection, to testify as to the responses, and that was upheld on appeal. The Seventh Circuit Court of Appeals held that, because the testimony was not offered to prove the truth of

the coin dealers' statements but only to establish the thoroughness of the investigation and its results, the testimony was not hearsay.

Similarly, in *Thomas v. State,* 54 Okl.Cr. 97, 14 P.2d 953, 954 (1932), the Court, discussing a situation where the State was attempting to prove that the person from whom the defendant claimed to have received a check was fictitious, held that:

> "The substance of the witness' testimony is that in his opinion no such person exists; his opinion is based on the one fact that he made inquiry in the neighborhood where such a person, if he existed, should be known, and was not able to learn of any such person. Testimony of the nonexistence of a claimed person is a matter of opinion, which may be based on what is usually termed hearsay. Such testimony is not strictly speaking hearsay, but circumstantial evidence tending to prove that the claimed individual had no existence in fact."

That statement of law has been frequently reaffirmed. *See, e.g., State v. Kern,* 307 N.W.2d 22 (Iowa 1981) (adopting the Oklahoma position as to the admissibility of such evidence); *McCormick on Evidence* § 249 (Edward Clearly ed., 2d ed. 1972), at 593–94.

The Court in *Dutton v. State,* 452 A.2d 127 (Del.1982), considered a situation where the defendant claimed, as part of his alibi, that there had been a fight in a certain tavern on a particular night, but a witness testified that she had gone to the tavern, interviewed people who had been there on the night in question, and learned that they had no recollection of such event. The Court found such testimony admissible and not hearsay, noting that:

> "[T]he majority of cases having dealt with negative results from inquiries appear to allow such evidence on the theory that 'fruitless inquiries are evidence of inability of the inquirer to find after diligent search and this in turn is circumstantial evidence of the nonexistence of the [fact] in question.' "

*Id.* at 143, quoting *McCormick on Evidence* § 249, at 594, and citing *Kern,* 307 N.W.2d at 26; and *State v. DePietro,* 243 La. 897, 148 So.2d 593 (1963) (admitting the sheriff's testimony that no one at the alleged shooting site had heard gunshots on the day in question as proof that shooting did not occur at the time and place claimed by the accused).

Other courts and sources agree. *See, e.g., New York Cent. R. Co. v. Pinnell,* 112 Ind.App. 116, 40 N.E.2d 988 (1942) (holding responses to inquiries made by private investigator evidence of diligence in search for absent witnesses); *Jendresak v. Metropolitan Life Ins. Co.,* 330 Ill.App. 157, 70 N.E.2d 863 (1946) (permitting proof of the presumption of death from seven year absence by testimony as to a diligent but unavailing inquiry as to the person and his whereabouts—responses to the questions not hearsay); *Jardine Estates v. Koppel,* 24 N.J. 536, 133 A.2d 1 (1957) (upholding the principle, but disallowing testimony of expert as to nonexistence of company and its operator where testimony revealed lack of diligence in investigation); *see also* 5 *Wigmore on Evidence* § 1414 (J. Chabourn rev., 1974) ("[R]eplies received during the search ought to be admissible [to indicate due diligence").

## Instruction On Inferences

We need not belabor appellant's final complaint. It is disposed of by *Hebron v. State,* 331 Md. 219, 627 A.2d 1029 (1993).

JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.