2025 IL App (1st) 231769

No. 1-23-1769

Filed September 24, 2025

Third Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County. |
| v. | ) ) | No. 22 CR 2809 |
| ANTONIO RAINEY, | ) ) | Honorable Steven G. Watkins, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE MARTIN delivered the judgment of the court, with opinion.
Justices Lampkin and Reyes concurred in the judgment and opinion.

**OPINION**

¶ 1        Following a bench trial, Antonio Rainey was convicted of four counts of aggravated

domestic battery and one count of unlawful restraint. The court sentenced him to five years'

imprisonment. On appeal, Rainey argues (1) he was not proven guilty beyond a reasonable doubt

because the victim disavowed her prior identification of Rainey as the offender and (2) the trial

court improperly allowed a witness to testify to the results of Internet database searches. We

affirm.[1]

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

¶ 2                                     I. BACKGROUND

¶ 3        Chicago police officers arrived at L.G.'s apartment in response to a report of a domestic

disturbance on the evening of October 20, 2021. They found her distraught, clothed in a towel, and

coughing up blood. L.G.'s face was bloodied and swollen. Blood was visible on the walls and

floor. L.G. told the officers and paramedics that Rainey, her former boyfriend, had beaten her. She

repeated his name to them several times, once spelling out his last name. The interaction was

captured on Officer Kylie McMahon's body worn camera (BWC). Footage from the BWC depicted

L.G. stating Rainey had beaten her. The trial court admitted L.G.'s statements captured on the

BWC as excited utterances.

¶ 4        L.G. was transported to a hospital, where she was found to have sustained blunt force

trauma to her face. Her left eye was badly swollen, her scalp was bruised, and her nose and cheeks

appeared disfigured. A CT scan revealed fractures to her nasal and cheek bones. L.G. told the

treating physician that her boyfriend had assaulted her. She was admitted to the hospital, as the

doctor and social workers believed she would be unsafe at home. L.G. remained in the hospital for

three days. She subsequently sought an order of protection against Rainey.

¶ 5        Detective Walter Martin spoke with L.G. by telephone on October 26, 2021. During their

conversation, she expressed interest in pursuing felony charges against Rainey. They met at a

police station on November 5, 2021, and reviewed medical records and photographs from L.G.'s

phone. L.G. met with Detective Martin four more times over the next few months, each time

maintaining Rainey was her assailant.

¶ 6        On February 8, 2022, L.G. met with Detective Martin and an assistant state's attorney. L.G.

gave a video-recorded statement recounting the October 20, 2021, attack in detail, again naming

Rainey as the perpetrator. According to her statement, L.G. received voicemail messages from

Rainey, stating he was coming to retrieve a Halloween mask and a pair of jeans that belonged to him. L.G. did not want Rainey at her apartment. Before he arrived, she gathered Rainey's belongings together. L.G. permitted Rainey to enter, but he remained longer than necessary to collect his belongings. She asked Rainey to leave but he refused. L.G. called Rainey's current girlfriend, asking her to come get him. L.G. later told Rainey she would call the police if he did not leave. The statement "set [him] off." L.G. exited her bathroom and brushed past Rainey in the hallway. He pushed her and a struggle ensued. Rainey hit L.G., knocking her to the floor. He then beat her with a long-handled dustpan. When the dustpan broke, Rainey looked for another object to use as a weapon. He found a kitchen chair and struck her with it. Next, Rainey got on top of L.G., placed his hands around her neck, and began choking her. L.G. tried to fight him off. She pushed Rainey's face and told him she could not breathe. Rainey relented upon seeing L.G.'s eyes "bucking out." L.G. rose to her feet. Rainey slapped her. She was out of breath and felt like she was going to faint. Rainey pushed her onto a couch and turned the air conditioner on. L.G. found her cell phone. A dispatcher could be heard asking questions. L.G. told Rainey she did not call 911 on purpose, but he "went belligerent" and resumed attacking her. L.G. attempted to escape through her back door. Rainey grabbed her and ripped her shirt. L.G. picked up a pair of scissors to defend herself. Rainey wrested the scissors from L.G. and attempted to stab her. Upon hearing an upstairs neighbor calling out, Rainey collected his belongings and fled from the apartment.

¶ 7    At trial, L.G. acknowledged making the videotaped statement, but she said she could not remember the specific statements. She also admitted that she had previously identified Rainey as her assailant but asserted he was not. Instead, she claimed she was attacked by a man named Tyler Wryles. L.G. testified she began seeing Wryles after breaking up with Rainey. She first met Wryles while attending college in Mississippi. Wryles was from Memphis, Tennessee, and stayed with

L.G. for two weeks in October 2021, while he was in Chicago. L.G. described Wryles's appearance as thin, with long braids, a wide nose, and prominent eyelids. He had several tattoos, including one on his arm of a Teenage Mutant Ninja Turtle. L.G. stated Wryles was affiliated with a gang and carried handguns. She believed his date of birth to be November 16 or 17 of 1998 or 1999. She specified that his last name was spelled W-R-Y-L-E-S.

¶ 8        According to her trial testimony, the attack occurred exactly as she had described in her videotaped statement, except the assailant was Wryles and he never choked her. When L.G. learned Wryles had another girlfriend, she demanded he leave her apartment. Wryles became enraged and began striking her with his fists. He punched L.G. in the face multiple times, causing her to bleed from her nose and mouth. Wryles also slammed her to the floor and struck her with a broomstick and chair. Wryles tore her shirt off when she tried to escape. L.G. managed to call 911 and was screaming for help. Wryles fled when an upstairs neighbor called out, saying she was calling the police. When paramedics and police officers arrived, L.G. was "really upset, hysterical." L.G. did not recall stating that Rainey had attacked her or spelling his name. She was bleeding, in pain, in an emotional state, and "probably saying a lot of stuff."

¶ 9        L.G. testified she told police Rainey was her attacker because Wryles had threatened to kill her if she named him and she was "more scared of [Wryles] than I ever will be of [Rainey]." Rainey was an "easy target," L.G. explained, because they "had history" and she was mad at him for ending their relationship. L.G. found Wryles throwing rocks at her window a few days after she was discharged from the hospital. He showed her a gun and threatened that she would die if she named him. L.G. stayed in a shelter out of fear of Wryles.

¶ 10        L.G. continued to identify Rainey to "keep the lie going." She also believed that no consequences would follow for Rainey, since he was in jail on other charges by that time. She did

not hear from the state's attorney's office (SAO) for months after her February 2022 statement. L.G. later learned that the State was seeking a prison sentence in this case. She had an "epiphany" and decided she did not want Rainey to "take the fall." She communicated with Rainey while he was in jail, sending him a letter and speaking by telephone. L.G. also spoke with Rainey's attorney and sent her a statement by text message, explaining she had falsely accused him. The message did not mention Wryles. She also informed the SAO that she did not want to pursue prosecution of the case.

¶ 11        The State called SAO investigator Marcella Solis to testify about her investigation of the name Tyler Wryles in database searches. The defense objected, contending that the results of Solis's searches were hearsay. Counsel noted the results were potentially admissible under the business records exception, but argued Solis could not lay the necessary foundation since she was not the keeper of the records. The court overruled the objection, ruling that the records may be necessary for Solis to testify about the results and quality of her investigation. The court added that it would determine how much weight Solis's testimony deserved.

¶ 12        Solis explained that she previously worked for the Chicago Police Department for 31 years and had been an SAO investigator for a year. Solis was asked to search for a person named either Tyler Wryles or Tyler Wyles, with a date of birth from 1997 through 2001. She used various database systems, including Accurint, I-Clear, FastPeople, FirstTwo, and VINELink, as well as databases maintained by the Illinois Department of Corrections and the Federal Bureau of Investigation. Solis had successfully located individuals using these databases throughout her career. On this occasion, Solis was unable to locate any record of a person by either name in that age range. In FastPeople, Solis found records of three individuals named Tyler Wryles: one in Kentucky, one in Pennsylvania, and the third in California. None of those individuals were within

the given age range or fit other identifiers Solis had been given. A search using Accurint yielded a record of a 71-year-old Wisconsin man named Tyler Wyles.

¶ 13   On cross examination, Solis testified she did not conduct searches using the last names Riles or Wiles, nor did she try alternate spellings of the first name. She did not conduct a search specific to Tennessee. Solis admitted she did not know how any of the databases obtained information or what, if any, measures each database uses for accuracy. She stated, however, that the databases often proved reliable in her experience.

¶ 14   A redacted transcript from the hearing on L.G.'s application for an order of protection against Rainey was admitted into evidence by stipulation. In that proceeding, L.G. stated under oath that Rainey had beaten her on October 20, 2021.

¶ 15   The court found L.G.'s prior recorded out-of-court statements naming Rainey were credible and the "true version of what occurred." Accordingly, the court found Rainey guilty on all counts. The court sentenced Rainey to five years' imprisonment. This appeal followed.

¶ 16                                    II. ANALYSIS

¶ 17                            A. Sufficiency of the Evidence

¶ 18   Rainey first claims the State failed to prove him guilty beyond a reasonable doubt. His argument requires us to review the sufficiency of the evidence. When reviewing the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Bush*, 2023 IL 128747, ¶ 33 (quoting *People v. Collins*, 106 Ill. 2d 237, 261 (1985)). A conviction will be set aside only when the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *Id.*

¶ 19    Rainey argues the evidence was insufficient to convict him because L.G.'s prior inconsistent statements were the sole evidence identifying him as the perpetrator. To be sure, "recanted prior inconsistent statements can be sufficient to support a conviction, even without corroborating evidence." *People v. Thomas*, 354 Ill. App. 3d 868, 878 (2004); *People v. Morrow*, 303 Ill. App. 3d 671, 677 (1999); *People v. Douglas*, 2014 IL App (5th) 120155, ¶ 28.

¶ 20    Nonetheless, Rainey argues that since no other evidence identified him, it is "objectively *** impossible to discern which is the true account of the battery" and deciding between L.G.'s conflicting statements is "essentially a coin flip." Not so. The trier of fact's very function is to assess the credibility of witnesses and resolve discrepancies and inconsistencies in the evidence. *People v. Jackson*, 2020 IL 124112, ¶ 66. This task includes determining which, if any, of a witness's inconsistent statements should be believed. See *id.* ¶ 68 (observing it was "up to the jury as trier of fact to determine whether [a witness's] statement was more credible than her subsequent recantation"). Moreover, the trial court, as trier of fact, "was in a much better position than we are to determine [L.G.'s] credibility and the weight to be accorded to her testimony." *Id.* ¶ 69.

¶ 21    Thus, we do not regard the trial court's credibility determination here like a coin flip, as Rainey urges. The trial court did not make an arbitrary decision. Rather, the trial court assessed L.G.'s credibility and determined her prior statements identifying Rainey as her attacker were truthful. The trial court's findings concerning credibility are entitled to great weight. *People v. Wheeler*, 226 Ill. 2d 92, 115 (2007). When findings of fact depend on the credibility of witnesses, we will defer to the trial court's findings unless they are against the manifest weight of the evidence. *People v. Clark*, 2014 IL App (1st) 130222, ¶ 26. A decision is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence. *Id.*

¶ 22    Here, L.G. repeatedly told the responding paramedics and police officers Rainey had beaten her. At that time, L.G. was distraught, she was badly beaten, her eye was swollen shut, and she was coughing blood. Thus, she was still under the stress of the event. In this condition, it strains credulity to believe she had the reflective capacity needed to consciously fabricate the identity of her attacker. Indeed, this was the reason the trial court found her statements from Officer McMahon's BWC video admissible as excited utterances. See Michael H. Graham, Handbook of Illinois Evidence § 803.2 (10th ed. 2025) ("The [excited utterance] exception is premised on the notion that the excitement caused by the event or condition temporarily stills the capacity for reflection, thus producing statements free of conscious fabrication ***."). In L.G.'s trial testimony, she described a deliberative process to name Rainey instead of Wryles. She reasoned that Wryles had threatened her, she feared Wryles more than Rainey, and Rainey made an "easy target" because of their "history." But such thinking would have required a reflective capacity L.G. likely did not possess in the immediate aftermath of the attack. L.G. contradicted herself at trial, testifying she was both hysterical and did not know what she was saying, yet explaining how she deliberately named Rainey instead of Wryles. For these reasons, the trial court could have reasonably determined her initial statements were truthful.

¶ 23    In addition, L.G. repeatedly maintained that Rainey was her attacker for months after the attack. She testified in support of an order of protection against him and named him on successive occasions to Detective Martin, even giving a video recorded statement. By the time of trial, more than a year had passed since the attack, L.G. had learned the State was seeking a six-year prison term, and she had communicated with Rainey as he awaited trial in jail. Thus, the trial court could reasonably find that her trial testimony naming a different person was not an admission to the truth but an attempt to help Rainey avoid the consequences he faced. Solis's inability to verify the

existence of Tyler Wryles further reduced the credibility of L.G.'s trial testimony. For these reasons, the trial court's determination that L.G.'s prior statements were the "true version of what occurred" was not against the manifest weight of the evidence.

¶ 24     To support his argument, Rainey cites prior decisions from this court in which recanted prior statements were found insufficient to sustain a conviction. See *People v. Arcos*, 282 Ill. App. 3d 870 (1996); *People v. Reyes*, 265 Ill. App. 3d 985 (1993); *People v. Brown*, 303 Ill. App. 3d 949 (1999); *People v. Parker*, 234 Ill. App. 3d 273 (1992). Those decisions, however, relied on the unique facts and circumstances of each case and do not contradict that "recanted prior inconsistent statements can be sufficient to support a conviction, even without corroborating evidence." *Thomas*, 354 Ill. App. 3d at 878. For instance, in *Arcos*, a disavowed prior statement was found insufficient when the trial court also found that the witness "had absolutely no credibility" and "would say anything to get the police to drop the charges against him." *Arcos*, 282 Ill. App. at 874. In *Reyes*, prior statements were found insufficient since they were "one-word responses" to questions rather than a detailed account of the crime. *Reyes*, 265 Ill. App. 3d at 989. In *Brown*, a prior statement was found insufficient when it was made two years after the crime and evidence showed the witness gave the statement to avoid being charged with a drug offense. *Brown*, 303 Ill. App. 3d at 965. Lastly, in *Parker*, prior statements from three witnesses were severely impeached by their trial testimony, which explained the circumstances that caused each to sign their prior statement. See *Parker*, 234 Ill. App. 3d at 275-78; *People v. Davis*, 2018 IL App (1st) 152413, ¶ 50 (describing the distinguishing facts of *Parker*). Unlike those cases, we are not persuaded that the facts and circumstances here render L.G.'s disavowed prior statements insufficient to sustain Rainey's conviction.

¶ 25                                    B. Admissibility of Search Results

¶ 26        Rainey next argues the trial court erred in allowing Solis to testify regarding the results she obtained from searching various databases when attempting to confirm the existence of Tyler Wryles. Rainey contends Solis's testimony was inadmissible hearsay and the business records exception did not apply.

¶ 27        A trial court's decisions on whether to admit evidence are reviewed for an abuse of discretion. *People v. Caffey*, 205 Ill. 2d 52, 89 (2001). An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court. *Id.*

¶ 28        Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. *People v. Moss*, 205 Ill. 2d 139, 159 (2001); Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). Hearsay is inadmissible unless excepted by the rules of evidence, the rules of the supreme court, or statute. Ill. R. Evid. 802 (eff. Jan. 1, 2011). But when an out-of-court statement is offered for some purpose other than to establish the truth of the matter asserted, the statement is not hearsay and is admissible. *Moss*, 205 Ill. 2d at 159. "Thus, whether a statement is hearsay depends upon the purpose for which it is offered." 29 Am. Jur. 2d *Evidence* § 652 (May 2025 Update).

¶ 29        Rainey asserts that the search results Solis testified to were offered for the truth of the matter asserted. We disagree. The significance of Solis's testimony was that she could find no record of a person named Tyler Wryles, or a similar name, who fit L.G.'s description. Testifying about an investigation's negative result can be challenging. As one commentator explained:

          "It is hard to prove a negative. If a witness, expert or not, has conducted a fruitless investigation, the witness may, of course, simply testify conclusively to the negative

results. But the significance of this testimony depends on the diligence of the investigator and the thoroughness of the investigation. \*\*\*

The responses that the witness got would be hearsay if offered to prove their truth. But the theory here is that the responses are offered, not for their truth, but only to prove how thorough the investigation was, so that the trier of fact can determine how much weight to place upon the testimony of the investigator." David F. Binder, Hearsay Handbook § 49:1 (4th ed. Aug. 2024 Update).

¶ 30     Here, Solis did not testify about records to prove the truth that other individuals named Tyler Wryles or Wyles existed. She testified about those records to demonstrate the thoroughness of her investigation. Had Solis merely testified in conclusive fashion that she could not substantiate the existence of Tyler Wryles, her testimony would have had little weight—the fact finder would not know what effort she made to reach her conclusion. But by describing the sources she examined, including whether those sources are commonly relied upon to locate individuals, and the results she obtained, Solis demonstrated her investigation was thorough. By doing so, she gave the factfinder a basis to give her testimony weight. Thus, the search results were offered for the purpose of proving the thoroughness of Solis's investigation. Since the records were offered for that purpose, they were not hearsay.

¶ 31     "The courts of several jurisdictions have held that, where a witness conducts a fruitless investigation, the witness's testimony as to the responses he received would be hearsay if offered for the truth of the responses but not if offered as proof of the thoroughness of the investigation." *Tu v. State*, 631 A.2d 110, 118 (Md. Ct. Spec. App. 1993). In *Tu*, a defendant charged with killing his wife, whose body was never found, claimed she had flown to California. *Id.* at 111-12. He presented evidence of a ticket issued in his wife's name for a flight to Los Angeles and an airline

agent testified that she told police she recalled seeing a woman resembling his wife board the flight. *Id.* at 112. Over the defendant's objections, a detective testified that he interviewed other airline employees and the flight crew, none of whom recognized the wife. *Id.* at 118. He also testified that three passengers who sat next to the seat indicated on the ticket stated the seat was empty. *Id.* The court found the responses the detective received were not hearsay since they were not offered for their truth, but to demonstrate the thoroughness of his investigation. *Id.* The defendant sought to show that the police neither sufficiently investigated whether his wife had travelled to California nor took proper account of the airline agent's statement. *Id.* The detective's testimony was offered to rebut that argument and demonstrate that the airline agent's recollection could not be corroborated. *Id.*

¶ 32        Similarly, in *United States v. Albiola*, 624 F.3d 431 (7th Cir. 2010), the existence of persons by the names written on address labels was at issue. The court found a postal inspector was properly allowed to testify to the responses he received in interviews he conducted to substantiate the existence of such persons. *Id.* at 440-41. And in *United States v. Blandina*, 895 F.2d 293 (7th Cir. 1989), the defendant claimed he sold a coin collection to dealers at shops in three cities. The court found an Internal Revenue Service agent could testify to the negative responses he received from the 61 coin dealers he interviewed in those cities. *Id.* at 300-01.

¶ 33        Like those cases, the records Solis testified to were not offered for their truth, but to demonstrate the diligence of her effort to substantiate L.G.'s claim that Tyler Wryles was her attacker. Defense counsel's questions on cross examination underscored that the thoroughness of Solis's investigation was at issue. For instance, counsel asked whether she tried different spellings or attempted to locate a person in Tennessee, since L.G. stated Wryles was from Memphis. In closing argument, defense counsel argued that Solis did not use "the most natural combination of

the facts that [L.G.] told" about Wryles, such as his date of birth or alternate spellings. Since Wryles's existence was essential to Rainey's defense, counsel sought to elicit other reasons to explain why Solis was unable to find him. Accordingly, it was appropriate for Solis to testify to the search results so the fact finder could determine how much weight to give her inability to substantiate the existence of Wryles.

¶ 34    Importantly, our recognition that out-of-court statements offered to demonstrate the thoroughness of an investigation are not hearsay is limited and should not be taken as an expansion of the "course of investigation" doctrine.[2] The "course of investigation" doctrine allows admission of statements to the extent necessary to explain steps taken by police in the investigation of a crime. *People v. Williams*, 2023 IL App (1st) 192463, ¶ 95. Since statements are admitted for that purpose, they are not offered for their truth. *Id.* This court has observed, however, that "the likelihood of misuse [is] great." (Internal quotation marks omitted.) *People v. Boling*, 2014 IL App (4th) 120634, ¶ 108. Therefore, "an officer may not testify to information beyond what is necessary to explain his or her actions." *In re Jovan A.*, 2014 IL App (1st) 103835, ¶ 35. Furthermore, it is improper for the prosecution to rely on such statements offered for this limited purpose in arguments to the jury. *Williams*, 2023 IL App (1st) 192463, ¶ 98. Doing so alters their purpose, effectively offering the statements for the truth of the matter asserted, making them hearsay. The same restrictions apply when out-of-court statements are offered to prove the thoroughness of an investigation.

---

[2]While often called the "course of investigation" exception (see, *e.g.*, *In re Jovan A.*, 2014 IL App (1st) 103835, ¶ 23; *People v. Williams*, 2023 IL App (1st) 192463, ¶ 95), it is inaccurate to refer to the doctrine as an exception to the hearsay rule. Exceptions to the hearsay rule are set forth in Illinois Rules of Evidence 803 and 804. Those rules recognize circumstances when hearsay—out-of-court statements offered for the truth of the matter asserted—are admissible. But when an out-of-court statement is admissible because it is not offered for the truth of the matter asserted, this is not an exception to the hearsay rule. The statement is simply not hearsay.

¶ 35    In sum, we conclude that the records of Solis's database searches were not hearsay, and the trial court did not abuse its discretion in allowing her testimony.

¶ 36                                    III. CONCLUSION

¶ 37    Based on the foregoing, we affirm the judgment of the circuit court.

¶ 38    Affirmed.

---

***People v. Rainey*, 2025 IL App (1st) 231769**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 22-CR-2809; the Hon. Steven G. Watkins, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Victoria Rose, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Eileen O'Neill Burke, State's Attorney, of Chicago (John E. Nowak, Matthew Connors, and Shannon Berkey, Assistant State's Attorneys, of counsel), for the People. |