2026 IL App (1st) 221873-U

FIFTH DIVISION
May 8, 2026

No. 1-22-1873

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 2016CR0098701 |
| | ) | |
| ANDRE HARRIS, | ) | Honorable |
| | ) | Arthur F. Hill Jr. |
| Defendant-Appellant. | ) | and John F. Lyke Jr., |
| | ) | Judges Presiding. |

JUSTICE MIKVA delivered the judgment of the court.
Justices Oden Johnson and Wilson concurred in the judgment.

**ORDER**

¶ 1  *Held*: We affirm the defendant's conviction for first degree murder. We reject his arguments that the State failed to prove his guilt beyond a reasonable doubt and that he is entitled to a new trial because the trial court erred in failing to suppress evidence, allowing prior statements of identification, and admitting hearsay evidence.

¶ 2  Andre Harris was convicted of first degree murder and sentenced to 45 years in prison. On appeal, he argues that the State failed to prove his guilt beyond a reasonable doubt. He also argues that the trial court erred in (1) failing to suppress evidence recovered from his home as the fruit of

his unlawful arrest and an unlawful search; (2) allowing the State's introduction of excessive and cumulative prior consistent identifications of him as one of the offenders; and (3) admitting hearsay evidence. For the following reasons, we affirm.

¶ 3                                     I. BACKGROUND

¶ 4     Mr. Harris and DeAngelo Green were alleged to have shot Leonard Brinson, who survived, and Lavell Southern, who died, on September 6, 2015. Mr. Harris and Mr. Green received severed but simultaneous jury trials. Mr. Harris was convicted of murder and the jury found that he personally discharged a firearm during the offense. Other related charges had been dismissed by the State before trial.

¶ 5                          A. Pretrial Motions to Suppress

¶ 6     Mr. Harris moved to quash his arrest and suppress evidence of two handguns that police officers found in his house, while executing a search warrant. The search occurred on the evening of September 6, 2015, after Mr. Southern was killed around 2 a.m. that morning. The officers obtained the search warrant after arresting Mr. Harris inside his home, when they observed a pair of jeans with suspected bloodstains inside a cereal box within a garbage bag.

¶ 7     Mr. Harris argued that, because the warrantless arrest violated his rights under the fourth amendment, any evidence discovered in connection with that arrest should be suppressed and could not be used to support a search warrant. He also argued that the search warrant should be suppressed under *Franks v. Delaware*, 438 U.S. 154 (1978), because the complaint for the warrant included misrepresentations.

¶ 8     In support of his *Franks* motion, Mr. Harris attached an affidavit from his mother, Irene Harris, in which she said that she put the garbage bag holding the jeans in the home's enclosed back porch before the officers entered, and later saw the officers take the bag from the enclosed

porch—contradicting the officer's statement in the affidavit for a warrant that the jeans were in plain view after she put the bag down outside. The court denied the *Franks* motion, finding that, even without the allegations about the garbage bag and jeans, there were sufficient facts in the complaint for a search warrant to justify issuing it.

¶ 9    The court proceeded at a subsequent hearing to address Mr. Harris's other bases for seeking to quash his arrest and suppress the guns. Ms. Harris testified at that hearing that at the time of the arrest, she lived with Mr. Harris in a single-family home on the 7100 block of Morgan Avenue, in Chicago. Mr. Harris woke Ms. Harris and stated that police officers were at the door. She opened the main front door but a "security door" protecting the main door was locked. The police officers said they wanted to speak to Mr. Harris. Ms. Harris told Mr. Harris this, returned to the door and closed it, and walked to the kitchen in the back of the house. Through a kitchen window, she saw more officers in her fenced backyard. She picked up a closed, drawstring garbage bag that was in the kitchen and put it in the enclosed back porch that was off the kitchen. She then opened the door from the enclosed porch to the outer porch. Two officers were on that porch and repeated that they wanted to speak to Mr. Harris. Ms. Harris turned to look towards the kitchen, where Mr. Harris was, and the officers walked past her and entered the house. Ms. Harris did not invite them in or hear Mr. Harris invite them in.

¶ 10    The officers arrested Mr. Harris and removed him from the home. Ms. Harris testified that she then saw officers on the ground-floor concrete porch in the backyard, searching the garbage bag that she had left in the raised, enclosed back porch. Ms. Harris asked the officers to leave but some remained in her house until 8:30 or 9 p.m., when others returned with a search warrant.

¶ 11    On cross-examination, Ms. Harris identified a photograph of the garbage bag, which is not included in the record on appeal. Ms. Harris denied saying, in a video-recorded statement she gave

at the police station that day, that she told the officers to go to the back of the house because she could not find the key to the security door, or that she then let them in. She also denied telling Mr. Harris that the officers at the back door wanted to speak to him and hearing him respond, "[O]kay."

¶ 12    The State published video clips of Ms. Harris's statement. In the video, which we have reviewed, she explains that she told the officers at the front door that she had misplaced the key for the security door and they should come around the back of the house, and when she approached the back door "to let them in," she "put a little loop" in the garbage bag and set it in the enclosed porch. She then relayed to Mr. Harris that the officers said they wanted to speak with him, and he said, "Okay." The officers "came on in." When asked if she let the officers in, Ms. Harris says, "Yes."

¶ 13    Mr. Harris then called, as witnesses, Chicago police officers Craig Lyke and Timothy Hayes. Officer Lyke testified that, the day Mr. Harris was arrested, Mr. Harris answered the front door, said he did not have the key to the security door, and called to his mother, who directed the officers to the back of the home. Officer Lyke later participated in the execution of the search warrant and found two handguns in the basement. Officer Hayes testified that he saw Ms. Harris let officers in the back door. She then exited with a garbage bag, appearing nervous. He told her to put it down and she put it on the ground-level concrete patio. A pair of jeans that appeared to have blood on them were protruding in "plain sight" from a cereal box at the top of the open bag. Without touching the jeans, Officer Hayes put the bag in a police car.

¶ 14    The State called former Chicago police sergeant James Ballauer, who testified that he was one of the officers who arrested Mr. Harris. Mr. Harris had answered the door but said he did not have a key for the security door. He then called to Ms. Harris, who said she also did not have a key. According to Sergeant Ballauer, both Ms. Harris and Mr. Harris told the officers to go to the

back of the house. Sergeant Ballauer walked around the side of the house and approached the back door. While doing so, he noticed a shell casing on the sidewalk leading around the house, and fresh blood droplets and shell casings on the ground near the back of the house. The interior back door was already open, and Ms. Harris opened the security door, stepped back, and allowed the officers to enter. The officers arrested Mr. Harris in the kitchen.

¶ 15    According to Sergeant Ballauer, after officers arrested Mr. Harris, Ms. Harris, appearing nervous, picked up a garbage bag and attempted to exit the back door. Sergeant Ballauer asked her not to move the bag, thinking she might be attempting to dispose of evidence. She did not put the bag down and walked out the door and onto the steps. Sergeant Ballauer told Officer Hayes not to let her leave with the bag and explained to Ms. Harris that the officers intended to secure the house and obtain a warrant to search it. Officer Hayes stopped her and she put the bag down. Sergeant Ballauer then drafted a complaint for a search warrant, which a judge authorized. The complaint, which is included in the record on appeal, cited Ms. Harris's conduct with the bag, the jeans, the blood and ballistic evidence that Sergeant Ballauer saw, and that witnesses had identified Mr. Harris as Mr. Southern's shooter.

¶ 16    The court denied Mr. Harris's motion. The court found that Ms. Harris intended to consent to the officers' entry and opened the back door for them. It also found that Ms. Harris had attempted to remove the garbage bag while the officers arrested Mr. Harris, and stated that the photograph of it showed it was "very full," and had "flaps" rather than a drawstring, and that "the Frosted Flakes box with a pair of jeans rolled up in it with apparent bloodstains" was "in many respects in plain view."

¶ 17                                B. Trial Evidence

¶ 18    The severed but simultaneous jury trials were held over several days in July 2022. The

5

evidence showed that Mr. Southern and Mr. Brinson were shot after 2 a.m. on September 6, 2015, following a confrontation outside a nightclub called Red Kiva on the 1100 block of West Randolph Street, in Chicago. The State called five eyewitnesses who, from various positions, saw Mr. Harris and Mr. Green holding guns before the shooting began, and some of the witnesses testified that they saw Mr. Harris or Mr. Green firing their guns. A medical examiner testified that Mr. Southern died by homicide from two gunshot wounds, and recovered a bullet from his body. Both handguns that officers recovered from Mr. Harris's house later that day were found to have discharged shell casings found near the nightclub, and one of the guns was found to be a possible match for the bullet recovered from Mr. Southern's body.

¶ 19                             1. Eyewitness Accounts of the Shooting

¶ 20    Jocelyn Allen, Nia Crawford, Senetra Cross, Tamika Fentress, and Kevon Herring provided eyewitness testimony. They had been part of a group, including Mr. Southern and Mr. Brinson, that had gathered at Red Kiva for a birthday party. The party ended and the group began to leave around 2 a.m. Some of the witnesses had consumed alcohol, but each of them testified that they were not impaired.

¶ 21    Ms. Crawford, Ms. Allen, Mr. Brinson, Mr. Herring, and another member of the group named Alim Muhammad began to walk down Randolph towards May Street and Ms. Crawford's parked car. Ms. Crawford, who was Mr. Southern's girlfriend, saw Mr. Harris and Mr. Green, both of whom she identified in court, on the street outside the club. She knew Mr. Harris, nicknamed "Drewood," through his girlfriend, and because he had attended Ms. Crawford's own recent birthday party. Ms. Allen, Ms. Cross, and Mr. Herring testified that they had also met Mr. Harris before and knew him as "Drewood."

¶ 22    Ms. Crawford briefly stopped to talk to Mr. Harris. Ms. Crawford, Ms. Allen, Mr. Herring,

Mr. Brinson, and Mr. Muhammad then continued walking to Ms. Crawford's car before Mr. Herring and Mr. Brinson, realizing that Mr. Southern was not with them, returned towards the club to find him. Ms. Crawford, Ms. Allen, and Mr. Muhammad entered Ms. Crawford's vehicle and drove back towards Red Kiva.

¶ 23    Mr. Herring testified that he and Mr. Brinson found Mr. Southern, and the three began walking towards Ms. Crawford's car, when a group of men outside the club started insulting them and attempting to start a conflict with them. Mr. Brinson responded to the men in a "pretty aggressive" tone, and "everybody started pulling out guns." Mr. Herring saw at least eight people holding guns. One of the men was Mr. Harris, whom Mr. Herring saw draw a "chrome" gun.

¶ 24    As this occurred, Ms. Allen, Ms. Crawford, and Mr. Muhammed arrived in Ms. Crawford's car. Ms. Allen saw Mr. Harris pointing a black and silver gun at Mr. Brinson, nodding, and moving towards him around the car, while Mr. Brinson shook his head and backed up with his hands up. Ms. Allen identified Mr. Green in court as another person who was near Ms. Crawford's car holding a gun. Ms. Crawford also saw Mr. Harris aiming a gun with a black handle and "silver top" at Mr. Brinson as he chased Mr. Brinson around her car. She turned onto May Street, parked, and exited the vehicle with Mr. Muhammad, while Ms. Allen remained in the car.

¶ 25    Ms. Cross and Ms. Fentress were in another car parked near the corner of Randolph and May. Ms. Cross was in the front passenger seat and Ms. Fentress was in the back seat. Ms. Fentress testified there was "a swarm" of people outside the club moving towards the corner where they were parked. Ms. Fentress saw Mr. Harris, whom she identified in court, pointing a silver gun with a black handle at Mr. Brinson. Ms. Fentress saw Mr. Green, whom she likewise identified in court, walking towards the crowd with a gun. Ms. Cross also saw Mr. Harris point a silver gun at Mr. Brinson.

¶ 26    Mr. Herring and Ms. Fentress testified that Mr. Southern stepped between Mr. Harris and Mr. Brinson with his hands up. They both saw another man then approach Mr. Southern and strike him in the head with a gun. Mr. Herring could not identify that man, but Ms. Fentress testified that it was Mr. Green.

¶ 27    Mr. Herring testified that, after Mr. Southern was struck, the scene got "pretty wild," with people "scrambling," and running away. Mr. Herring followed Mr. Harris, whom he saw pursue Mr. Southern and Mr. Brinson as they ran away from Red Kiva. Over defense counsel's objection, the court, citing the hearsay exception for a coconspirator's statement, allowed Mr. Herring to testify that the person who struck Mr. Southern with a gun then yelled, "blow, blow, blow, Wood, blow, blow, blow." Mr. Herring explained that "blow" meant "[s]hoot." Following this statement, Mr. Harris stopped running, planted his feet, and shot. The man who had made the statement then fired his own gun towards Mr. Herring. Mr. Herring saw Mr. Southern and Mr. Brinson turn off Randolph onto another street before he ran away himself. Mr. Herring testified that Mr. Harris's nickname was "Drewood," and Mr. Brinson's was "Lenwood."

¶ 28    From Ms. Crawford's vehicle, Ms. Crawford and Ms. Allen saw people running west towards Racine Avenue. Ms. Crawford exited her vehicle, and saw Mr. Green, in the median of Randolph, raise his gun and chase the people running. She had a "clear view" of his "side profile" in the street lights. She ran back to her car and, while she did so, heard a round of six or seven gunshots, then another round of "about four" gunshots. Ms. Allen heard gunshots and saw sparks from a gun fired by a person standing in the median of Randolph. Ms. Crawford moved her car out of the middle of the street, and exited again to look for Mr. Southern. Ms. Allen then moved into the front seat of the car, made a U-turn, and began driving down Randolph towards Racine.

¶ 29    From the other vehicle, Ms. Fentress and Ms. Cross also heard gunshots. Ms. Cross could

not see who fired them, but Ms. Fentress saw Mr. Harris fire three or four times while he stood on Randolph, near the sidewalk. She then heard about 10 more gunshots, but could not see where they came from. No witness saw anyone besides Mr. Harris or Mr. Green fire a gun.

¶ 30    Mr. Herring testified that, after briefly running away, he retraced his steps and found Mr. Brinson, who had been shot in the arm, and Mr. Southern, who had been shot in the back, lying on the ground. Mr. Herring called 911, and an ambulance took both men to a hospital. Mr. Herring, Ms. Crawford, Ms. Allen, Ms. Fentress, and Ms. Cross went to the hospital. Mr. Southern died. The witnesses then went to a church where Mr. Southern's father was the pastor. Ms. Crawford testified that a police officer was there but she did not remember his name or whether she told him the street corner where Mr. Harris lived or the type of car Mr. Harris drove.

¶ 31                              2. The Witnesses Identify Mr. Harris and Mr. Green

¶ 32    Over Mr. Harris's objection, Chicago police lieutenant Ronald Kimble, who was Mr. Southern's uncle, testified about his conversation with Ms. Crawford at the church that she had not remembered. He testified that she told him that someone named something like "Dre" or "Jaywood" was involved in the shooting, and that person lived "toward the end" of the 7100 block of Morgan and drove a silver vehicle, for which she "mentioned something about the first letters of the license plate."

¶ 33    Later that day or the next, the five eyewitnesses went to the police station, viewed photograph arrays, and identified Mr. Harris. The photograph arrays and their corresponding advisory forms were admitted into evidence and published to the jury. Each advisory form included a statement, written by a police officer, explaining who the witness said the identified person was. According to the forms, Ms. Allen indicated she identified Mr. Harris as "the one with the gun chasing [Mr. Brinson]," Ms. Crawford indicated that he "chase[d] [Mr. Brinson] with a gun," and

Ms. Fentress stated he was "the guy who had the gun and shot at [Mr. Southern and Mr. Brinson]." Ms. Cross's form said, "It looks like him." Mr. Herring wrote on the photograph array that the person he identified was "[t]he shooter know[n] as Dre-wood," which the administrator also wrote on the advisory form.

¶ 34   The witnesses further testified that they later returned to the police station and gave video recorded statements, and all but Mr. Herring testified that they also testified before the grand jury. When giving their video-recorded statements and testifying before the grand jury, the witnesses were shown the photograph arrays they had previously viewed. Each time the witnesses testified about viewing the photograph arrays again, the State republished the corresponding array and advisory form. The State also called the police officers who administered the photograph arrays to testify that at the time, they did not know who Mr. Harris was, and the State republished each photograph array and advisory form during the officers' testimonies. Mr. Harris repeatedly objected to the State's publishing of the exhibits.

¶ 35   Several months later, Ms. Allen and Ms. Fentress identified Mr. Green in photograph arrays, and Ms. Crawford identified him in a live lineup. Ms. Allen and Ms. Crawford testified that they then gave video-recorded statements, during which they viewed the advisory forms from their identifications again. The detectives who administered the photograph arrays and lineup also testified. Throughout this testimony, the advisory form reflecting that Ms. Allen identified Mr. Green was published three times, the form for Ms. Fentress was published once, and the form for Ms. Crawford was published twice. The form for Ms. Crawford indicated that Mr. Harris was "the 1st shooter," and Mr. Green was "the second shooter."

¶ 36       3. The Police Recover Firearms Linked to the Shooting in Mr. Harris's Home

¶ 37   The medical examiner testified that Mr. Southern suffered two gunshot wounds. One bullet

10

grazed the side of his head and his ear, and another entered his back and struck his spleen, intestine, stomach, diaphragm, and heart, causing massive internal bleeding. The examiner recovered that bullet from Mr. Southern's chest. Mr. Southern had also suffered a laceration on the back of his head that was likely from falling or being hit with something, possibly a gun.

¶ 38    Ballistic evidence included six .45-caliber fired cartridge casings found on the sidewalk or in the street near the curb at 1142 Randolph, five 9-millimeter fired cartridge casings on Randolph near the median, a red sedan at 1152 Randolph and a white van at 1158 Randolph with possible bullet damage, and a .45-caliber fired bullet on the sidewalk near the red sedan. When executing the search warrant, Officer Lyke discovered a .45-caliber Sig Sauer handgun that was silver with a black handle, and a dark-colored blue-steel 9-millimeter Glock 19 handgun in "a drop ceiling air duct area" in the basement of the house where Mr. Harris was arrested.

¶ 39    An Illinois State Police forensic scientist testified as an expert in firearm identification that the .45-caliber fired cartridge casings were fired from the Sig Sauer and the 9-millimeter fired cartridge casings were fired from the Glock. The bullet recovered from Mr. Southern's body was a ".38 class caliber" bullet, which meant it was in the same "class" and had the same diameter as a 9-millimeter bullet. The bullet had "six polygonal lands and groove impressions with a right hand twist," and the Glock firearm also had "six right polygonal rifling." However, the forensic scientist's determination of whether that Glock fired the bullet was "inconclusive." The .45-caliber bullet found near the red car on Randolph was not fired from the .45-caliber Sig Sauer.

¶ 40    A detective testified that, in one of the bedrooms in the house where Mr. Harris was arrested, he found four pieces of mail addressed to Mr. Harris, a medication prescription for Mr. Harris, and Mr. Harris's identification, all of which bore the house's address.

¶ 41                              4. Mr. Harris's Case

¶ 42     After the State rested, Mr. Harris presented a stipulation that an investigator with the state's attorney's office would testify that, the day before Mr. Herring testified, Mr. Herring said to the investigator and an assistant state's attorney that he did not know Mr. Harris "as in [his] earlier video statement he related he did." According to the stipulation, one of the prosecutors then interviewed Mr. Herring. Mr. Herring told the prosecutor that he did not know Mr. Harris and that, after Mr. Southern's murder, people showed him social media pictures of "Drewood" and told him that was one of the shooters. Mr. Herring had seen a gun and a muzzle flash but only identified Mr. Harris to please Mr. Southern's family.

¶ 43     C. Closing Arguments, The Jury's Verdict, Posttrial Proceedings, and Sentencing

¶ 44     During closing argument, the State argued that Mr. Harris was guilty of first degree murder under an accountability theory. The State pointed to evidence that Mr. Harris and Mr. Green fired the guns recovered from Mr. Harris's house, with Mr. Green striking Mr. Southern in the back with the .38-caliber class bullet that was found in his body. The State republished the advisory forms and photograph arrays from the witnesses' identifications of Mr. Harris and noted that they consistently identified him as one of the shooters, including when Ms. Crawford told Lieutenant Kimble Mr. Harris's address, the color of his car, and a portion of his license plate.

¶ 45     Mr. Harris argued that, based on their positioning, the witnesses were unable to see who fired the gunshots they heard and had misidentified him and Mr. Green as the shooters.

¶ 46     Following argument, the court issued the jury instructions, which included an explanation of when a person is legally responsible for the conduct of another. After deliberating, the jury found Mr. Harris guilty of first degree murder and that the State proved that he personally discharged a firearm during the commission of the offense. The jury in Mr. Green's case found Mr. Green guilty of first degree murder but concluded that the State had not proven that Mr. Green

personally discharged a firearm.

¶ 47    Mr. Harris filed a motion to reconsider or for a new trial, and an amended motion, which the court denied. The court sentenced Mr. Harris to 25 years in prison for one merged count of first degree murder, with an additional 20-year enhancement for personally discharging a firearm during the commission of the offense, for a total of 45 years in prison.

¶ 48                                II. JURISDICTION

¶ 49    The court sentenced Mr. Harris and denied his motion to reconsider the sentence on November 29, 2022. He timely filed his notice of appeal on December 5, 2022. We therefore have jurisdiction under article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606 (eff. Mar. 12, 2021), which govern appeals from final judgments in criminal cases.

¶ 50                                III. ANALYSIS

¶ 51                        A. The Sufficiency of the Evidence

¶ 52    Mr. Harris argues that the State failed to prove him guilty of first degree murder beyond a reasonable doubt. Mr. Harris makes several arguments. The primary one is that there is no evidence that he fired the bullet that killed Mr. Southern. However, Mr. Harris was convicted of Mr. Southern's murder based on the theory that Mr. Green fired the shot that killed Mr. Southern and Mr. Harris was accountable for Mr. Green's conduct. Thus, the absence of evidence that Mr. Harris personally fired the bullet that killed Mr. Southern is simply irrelevant. His other arguments are that there may have been a third shooter, and that no witness testified that Mr. Green discharged his gun and Mr. Green was acquitted of discharging a firearm during the commission of this murder. We address each of these in turn.

¶ 53    When a defendant challenges the sufficiency of the evidence we must determine "whether,

after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis and internal quotation marks omitted.) *People v. Bush*, 2023 IL 128747, ¶ 33. In doing so, we must draw all reasonable inferences in favor of the State. *Id.* It is the factfinder's responsibility to weigh the evidence, resolve conflicts in testimony, and draw reasonable inferences from the facts. *People v. Gray*, 2017 IL 120958, ¶ 35. Therefore, we will not substitute our judgment for the factfinder's on questions involving witness credibility or the weight of the evidence, or retry a defendant. *People v. Jones*, 2023 IL 127810, ¶ 28. Rather, we will disturb a conviction only where "the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Id.* The same standard applies to a question about a defendant's accountability for an offense. *People v. Fernandez*, 2014 IL 115527, ¶ 13

¶ 54   Here, the evidence provided sufficient basis for a rational factfinder to find that Mr. Green fired the shot that killed Mr. Southern, and that Mr. Harris was accountable for that act. The witnesses testified that Mr. Harris pointed a chrome, silver, or silver and black gun at Mr. Brinson. The witnesses also saw Mr. Green with a gun, and after Mr. Southern stepped between Mr. Harris and Mr. Brinson, Ms. Fentress saw Mr. Green strike Mr. Southern with his gun. When Mr. Southern and Mr. Brinson ran away, Mr. Herring heard the person who hit Mr. Southern say "blow, Wood, blow," and saw Mr. Harris stop chasing Mr. Southern and Mr. Brinson and fire his gun. Ms. Fentress also saw Mr. Harris fire his gun, while he was on Randolph near the sidewalk. Mr. Herring testified that the person who made the "blow, Wood, blow" statement then fired at him. Ms. Crawford testified that Mr. Green was near the Randolph median, and Ms. Allen saw sparks coming from a gun fired by a person in that location.

¶ 55   Officers recovered .45-caliber shell casings on or near the sidewalk, and 9-millimeter shell

casings near the median. A silver and black .45-caliber Sig Sauer handgun and a 9-millimeter Glock handgun were found in Mr. Harris's home later that day, and a forensic scientist determined that those weapons deposited the shell casings. Additionally, the medical examiner recovered from Mr. Southern's body a .38-caliber class bullet with characteristics that matched the Glock.

¶ 56 Viewing the totality of this evidence in the light most favorable to the State and drawing all reasonable inferences in favor of the State, the jury could logically conclude that the bullet which entered Mr. Southern's back and damaged several of his organs caused his death and was fired by Mr. Green with the Glock handgun found in Mr. Harris's basement. *People v. Galarza*, 2023 IL 127678, ¶ 27 (noting that the factfinder need not be satisfied beyond a reasonable doubt as to each link in a chain of circumstances if the totality of the evidence establishes guilt beyond a reasonable doubt).

¶ 57 A person is accountable for another's commission of an offense when "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2014). To prove that a defendant possessed the intent to promote or facilitate a crime, the State may show "either (1) the defendant shared the criminal intent of the principal, or (2) there was a common criminal design." *Fernandez*, 2014 IL 115527, ¶ 13. A person possesses the criminal intent for first degree murder if he intends to kill or do great bodily harm to the deceased individual or another. 720 ILCS 5/9-1(a)(1) (West Supp. 2015).

¶ 58 A rational factfinder could conclude that Mr. Harris, who fired multiple shots towards Mr. Southern and Mr. Brinson, apparently at Mr. Green's urging to "blow," shared Mr. Green's intent to kill or cause great bodily harm to Mr. Southern and aided or attempted to aid Mr. Green's murder

of Mr. Southern. This makes Mr. Harris responsible for Mr. Green's conduct. 720 ILCS 5/5-2(c) (West 2014) (a person may be held accountable for another's commission of an offense where, with the intent to promote or facilitate the offense, he aids or attempts to aid in the offense's commission).

¶ 59    Mr. Harris's arguments about whether the witnesses could observe what they testified to are a request that we reweigh the evidence on appeal, which we may not do. *Jones*, 2023 IL 127810, ¶ 28. He argues that Ms. Fentress—whose testimony confirmed that the person who said "blow, Wood, blow" and fired at Mr. Herring was Mr. Green, and that Mr. Harris fired while near the sidewalk and therefore from the location of the .45-caliber casings—was ill-positioned to actually observe the events, raising a question of witness credibility that the jury resolved against him.

¶ 60    Mr. Harris also suggests that there was a third shooter who may have caused Mr. Southern's death. The only evidence that he can identify to support this is the .45-caliber bullet recovered on Randolph near the red sedan which ballistics found was not fired from the Sig Sauer that the police recovered. However, as the bullet recovered from Mr. Southern's body was a .38-caliber class bullet, the existence of another shooter with a .45-caliber gun would not impact the sufficiency of the evidence for the murder conviction. Further, as the State notes, no evidence establishes when or from where this .45-caliber bullet was fired, where all the .45-caliber shell casings recovered were matched to the Sig Sauer. The speculative possibility that there was a third shooter, who was never mentioned by any of the witnesses, does not provide any basis for finding this evidence insufficient. See *Galarza*, 2023 IL 127678, ¶ 25 (noting that the factfinder need not search out all possible explanations consistent with innocence and give them the weight of reasonable doubt).

¶ 61    Mr. Harris also notes that the jury in Mr. Green's trial found that the State did not prove

that Mr. Green personally discharged a firearm. The evidence discussed, however, was clearly sufficient to conclude that Mr. Green fired his gun. Because Mr. Harris and Mr. Green were tried before different juries, the juries' decisions need not be consistent with one another. See *People v. Torres*, 306 Ill. App. 3d 301, 312 (1999) ("In separate trials before different triers of fact, the acquittal of one defendant is of no consequence to the trial of the codefendant."); *People v. Wehmeyer*, 155 Ill. App. 3d 931, 944 (1987) ("Provided the trier of facts [*sic*] determination is reasonable and supported by the evidence, we see no reason why the determinations of separate triers of fact following a joint trial requires absolute consistency.").

¶ 62    In sum, the witnesses' testimony and the ballistic evidence were sufficient to establish that Mr. Harris was guilty of Mr. Southern's murder under an accountability theory.

¶ 63                                    B. The Fourth Amendment

¶ 64    Mr. Harris argues that his arrest violated the fourth amendment because it was made in his home, which the officers entered without a warrant, consent, or exigent circumstances. During the arrest, the officers saw what they suspected to be bloody jeans in a garbage bag. The discovery of those jeans was cited by the officers as evidence providing probable cause for a warrant to search the home, and when executing that warrant they found the guns used in Mr. Southern's shooting. Mr. Harris therefore argues that the search warrant was premised on evidence that was obtained through his unlawful arrest, meaning that the guns found pursuant to the warrant were the fruit of a fourth amendment violation and should have been suppressed.

¶ 65    Evidence obtained directly or indirectly through an unreasonable search or seizure, and therefore in violation of the fourth amendment, must be suppressed and cannot be used as proof at trial. *People v. Schreiner*, 2021 IL App (1st) 190191, ¶¶ 67-68. When a defendant moves to suppress evidence, he must make a *prima facie* case that it was obtained through an unreasonable

search. *Id.* ¶ 36. The State must then show that the search was not unreasonable. *Id.* "The ultimate burden of proof, however, rests with [the] defendant." *Id.*

¶ 66 The denial of a motion to quash an arrest and suppress evidence is subject to a two-part standard of review. *People v. Clark*, 2024 IL 127838, ¶ 30. We defer to the trial court's factual findings and credibility determinations and accept them, unless they are against the manifest weight of the evidence. *Id.* However, we review *de novo* the trial court's ultimate ruling of whether suppression is warranted. *Id.*; *Schreiner*, 2021 IL App (1st) 190191, ¶ 35.

¶ 67 1. The Officers Had Consent to Enter Mr. Harris's Home

¶ 68 Mr. Harris first argues that the officers unlawfully entered his home to arrest him. Where officers have voluntary consent to enter a home and probable cause to arrest the defendant, the defendant's fourth amendment rights are not violated. *Clark*, 2024 IL 127838, ¶ 32 (citing *People v. Bean*, 84 Ill. 2d 64, 69 (1981)). The arrestee need not be the one to give consent, as long as it is given by someone with authority over the premises. *Schreiner*, 2021 IL App (1st) 190191, ¶ 42. Consent can be nonverbal if the intention to give consent is "unmistakably clear" and is more than "mere acquiescence to apparent authority." (Emphasis and internal quotation marks omitted.) *Id.* ¶¶ 51-52. The State bears the burden of proving whether consent was voluntarily given (*id.* ¶ 41), a question of fact (*People v. Anthony*, 198 Ill. 2d 194, 202 (2001)).

¶ 69 Here, the trial court found that Mr. Harris's mother, who lived in the home and therefore possessed authority over it, voluntarily consented to the officers' entry. That finding was not against the manifest weight of the evidence. Sergeant Ballauer testified that, when officers came to the house's front door, Mr. Harris answered but said he could not open the security door. He called for his mother, Ms. Harris, who said she did not have the key for the security door. According to Sergeant Ballauer, both she and Mr. Harris told them to come around to the back of

the house. There, Ms. Harris opened the rear security door and stepped back to let the officers in. This comported with the account Ms. Harris gave in her recorded interview and Officer Hayes's testimony that he saw Ms. Harris let the officers in the back door. This evidence supports the court's conclusion that Ms. Harris consented to the officers' entry.

¶ 70 Mr. Harris argues that Ms. Harris's testimony was more credible than the officers'. However, Ms. Harris made statements in her interview that contradicted her hearing testimony. Even without this contradiction, the court was entitled to believe the officers over her. The court's finding that there was consent is not against the manifest weight of the evidence because it is not unreasonable, arbitrary, or unsupported by evidence. *People v. Morgan*, 2025 IL 130626, ¶ 21. We will not overturn it on appeal.

¶ 71 2. The Discovery of the Jeans Does Not Require Suppression of the Firearms

¶ 72 Mr. Harris next argues that, even if the officers had consent to enter his home, they lacked consent to search the home, beyond conducting a protective sweep. See *People v. Hagestedt*, 2025 IL 130286, ¶ 31 (citing *People v. Mikrut*, 371 Ill. App. 3d 1148, 1153 (2007) (officers unlawfully expanded the scope of their entry into the defendant's home when they secured him in the living room but then proceeded into a bedroom)). He argues the officers therefore violated his fourth amendment rights when they searched the garbage bag and seized the jeans with suspected bloodstains that were cited in the application for the search warrant.

¶ 73 We agree that the scope of the officers' entry was limited. However, in this case, the trial court found that the jeans were plainly visible when Ms. Harris put the garbage bag down. When an officer observes contraband in open view from a lawful vantage point, he has not undertaken a "search" under the fourth amendment, because a search is "a prying into hidden places for that

which is concealed." (Internal quotation marks omitted.) *Id.* ¶ 28.

¶ 74     Sergeant Ballauer testified that, after Mr. Harris was arrested, Ms. Harris, appearing nervous, picked up a garbage bag and attempted to leave out the back door with it. Officer Hayes testified that he stopped her and, after Ms. Harris set down the bag, he observed that it was open, and in "plain sight," he saw a pair of jeans that appeared to have blood on them protruding from a cereal box at the top of the bag. When announcing its findings, the trial court stated that the jeans inside the cereal box were in plain view.

¶ 75     Mr. Harris argues that it "would be impossible to view stains [on] a pair of jeans stuffed in a cereal box contained within a garbage bag" without searching the bag and removing the jeans, which is what Ms. Harris testified that the officers did. Ms. Harris also stated, in her electronically recorded interview, that she tied the bag and put it on the enclosed porch. However, the trial court was entitled to disbelieve her and believe the officers. We cannot say that the trial court's credibility findings or ultimate finding that the jeans were in plain view were against the manifest weight of the evidence. See *Clark*, 2024 IL 127838, ¶ 30 (when reviewing a denial of a motion to suppress, the trial court's factual findings and credibility determinations may only be disturbed if against the manifest weight of the evidence).

¶ 76     Mr. Harris does not argue that the officers violated the fourth amendment by instructing his mother to put down the bag or to stop when she tried to leave with it. However, even if these instructions could be considered a seizure of Ms. Harris, that would only implicate her fourth amendment rights, not Mr. Harris's, and thus would not provide him with a basis for suppressing the evidence against him. *Hagestedt*, 2025 IL 130286, ¶ 22 (citing *Alderman v. United States*, 394 U.S. 165, 174 (1969), for the proposition that fourth amendment rights are personal rights that may not be vicariously asserted).

¶ 77    To the extent that these instructions could be considered a seizure of the garbage bag itself, these officers acted reasonably in preventing Ms. Harris from potentially disposing of evidence before the officers could obtain a search warrant. See *People v. Kratovil*, 351 Ill. App. 3d 1023, 1032 (2004) (citing *Segura v. United States*, 468 U.S. 796, 810 (1984), for the proposition that "securing a dwelling to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure"). In short, there was no unreasonable search or seizure that allowed the officers to view the jeans in the garbage bag.

¶ 78                        C. Prior Consistent Identifications

¶ 79    Mr. Harris next claims that the State introduced excessive prior consistent identification testimony. In addition to the witnesses' in-court identifications of him as the person who pointed and fired a gun at Mr. Brinson and Mr. Southern, the State presented testimony that the witnesses identified Mr. Harris as that person in photograph arrays, and confirmed those identifications when giving video-recorded statements and when testifying to the grand jury. The State also called the police officers who administered those photograph arrays. Mr. Harris argues that this violated his right to due process because the excessive prior identification testimony gave the jury a false impression of the strength of the State's case.

¶ 80    A statement which would otherwise be inadmissible hearsay is not hearsay if (1) the declarant testifies, (2) the declarant is subject to cross-examination concerning the statement, and (3) "the statement is one of identification of a person made after perceiving him." 725 ILCS 5/115-12 (West 2022). Illinois Rule of Evidence 801(d)(1)(B) provides nearly identical wording. See Ill. R. Evid. 801(d)(1)(B) (eff. Oct. 15, 2015). Accordingly, a witness's prior consistent statement, which would normally be inadmissible because it could "unfairly enhance the witness's credibility," is admissible so long as it is a statement of identification. *People v. Temple*, 2014 IL

App (1st) 111653, ¶ 34.

¶ 81 A prior statement of identification is admissible as substantive evidence. *People v. Neal*, 2020 IL App (2d) 170356, ¶ 33. In Illinois, police officers or other third parties may also testify about a witness's prior statement of identification. *Id.* ¶ 37. The statement may go beyond the mere fact that the witness identified the defendant and include "the entire identification process," so the factfinder is "fully informed concerning the reliability of a witness' identification, as well as the suggestiveness or lack thereof in that identification." (Internal quotation marks omitted.) *Temple*, 2014 IL App (1st) 111653, ¶ 37. The prior statement "may include a description of the offense only to the extent necessary to make the identification understandable to the jury, but it may not go beyond that to provide detailed accounts of the actual crime." (Internal quotation marks omitted.) *People v. Anderson*, 2018 IL App (1st) 150931, ¶ 42.

¶ 82 Mr. Harris does not dispute that the statements at issue were admissible or that neither section 115-12 nor Rule 801(d)(1)(B) limit the number of statements of identification that a party can introduce. He cites Rule of Evidence 403, which provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Ill. R. Evid. 403 (eff. Jan. 1, 2011). Mr. Harris argues the evidence of the witnesses' prior identifications of him was excessive and cumulative, given that the witnesses had already identified him in open court. He also contends the evidence was prejudicial, because its repetition made the jurors more likely to find the identifications credible.

¶ 83 A trial court's decision regarding whether evidence violates Rule 403 is reviewed for an abuse of discretion. *People v. Epstein*, 2022 IL 127824, ¶¶ 10, 20. "An abuse of discretion occurs

when the ruling is arbitrary, fanciful, or unreasonable or when no reasonable person would adopt the trial court's view." *People v. Heintz*, 2026 IL 131340, ¶ 37. We cannot say that the court here abused its discretion.

¶ 84　Cumulative evidence is that which "adds nothing to what was already before the jury." (Internal quotation marks omitted.) *People v. White*, 2011 IL App (1st) 092852, ¶ 44. The fact that the witnesses (1) identified Mr. Harris in photo arrays; (2) confirmed in the following days that they had identified him; and (3) confirmed their identification again before the grand jury, was evidence that they had consistently and confidently identified Mr. Harris. This was in contrast to Mr. Herring, who waffled about his identifications the day before he testified. The fact that the other witnesses had multiple opportunities to reconsider their identifications and did not do so corroborated their in-court identifications, a proper purpose for which identification statements may be admitted. *Neal*, 2020 IL App (2d) 170356, ¶ 33. The testimony of the officers who administered the photograph arrays was relevant to show a lack of suggestiveness on the part of the police. None of this testimony was cumulative.

¶ 85　Our courts have recognized a valid concern over "possible 'endless repetitions' of prior identifications," where, for example, a parade of witnesses testify that they were present when a person made a single identification. *Id.* ¶ 44. That is not this case. Rule 403 only bars evidence where its probative value is "*substantially* outweighed" by the danger of unfair prejudice or the needless presentation of cumulative evidence. (Emphasis added.) Ill. R. Evid. 403 (eff. Jan. 1, 2011). We cannot say that the court's decision that the evidence did not violate Rule 403 was arbitrary, fanciful, or unreasonable. It therefore was not an abuse of discretion. *Heintz*, 2026

IL 131340, ¶ 37.

¶ 86                              D. Hearsay Evidence

¶ 87    Mr. Harris's other arguments are that the trial court abused its discretion by admitting various hearsay statements. Hearsay is a statement, other than one made while testifying at trial, offered in evidence to prove the truth of the matter asserted. Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). Hearsay is inadmissible unless an exception or exemption applies. Ill. R. Evid. 802 (eff. Jan. 1, 2011). The admission of evidence is reviewed for an abuse of discretion. *People v. Caraga*, 2018 IL App (1st) 170123, ¶ 36.

¶ 88                         1. Mr. Green's "Blow, Wood, Blow" Statement

¶ 89    Mr. Harris alleges that the court improperly admitted Mr. Green's statement "blow, Wood, blow," made just before Mr. Harris, who witnesses testified was nicknamed "Drewood," fired his gun. The trial court ruled before trial that the statement was inadmissible, but on motion of the State during trial, determined it was admissible as the statement of a co-conspirator.

¶ 90    Statements that would otherwise be hearsay are admissible if made by a coconspirator during and in furtherance of a conspiracy, which is an agreement to commit a criminal act, because they are not offered for the truth of the matter asserted but to show the existence and object of the conspiracy. *Id.* ¶¶ 37-38. Statements made to further a conspiracy include those "advising, encouraging, aiding or abetting its perpetration ***." (Internal quotation marks omitted.) *People v. Jaimes*, 2019 IL App (1st) 142736, ¶ 64.

¶ 91    For a conspirator statement to be admissible, the State must make a *prima facie* showing that the declarant and the defendant were members of a conspiracy. *Caraga*, 2018 IL App (1st) 170123, ¶¶ 37, 39. To do so, the State must prove by a preponderance of the evidence that (1) they intended to commit a crime, (2) they engaged in a common plan to commit the crime, and (3) at

least one of them committed an act in furtherance of the conspiracy. *Jaimes*, 2019 IL App (1st) 142736, ¶ 64. The evidence of a conspiracy must be independent of the coconspirator's hearsay statements. *Id.* However, because criminal conspiracies are naturally clandestine, they are "almost never susceptible of direct proof," and the court may draw "broad inferences" from the circumstances and the parties' actions. *Caraga*, 2018 IL App (1st) 170123, ¶ 39. The State need not provide written or verbal proof of an agreement if the evidence shows there was a common design to pursue a criminal purpose. *People v. Edwards*, 74 Ill. App. 2d 225, 230-31 (1966). A court may consider actions occurring after the coconspirator made the statement when determining whether a conspiracy existed at the time the statement was made. *People v. Coleman*, 399 Ill. App. 3d 1198, 1204 (2010) (citing *People v. Davis*, 46 Ill. 2d 554, 556-58 (1970)).

¶ 92     The trial court here did not abuse its discretion. Mr. Harris and Mr. Green were part of a group that confronted Mr. Brinson and Mr. Herring outside Red Kiva. After Mr. Brinson responded, Mr. Harris and Mr. Green drew guns, and Mr. Harris pointed his gun at Mr. Brinson. When Mr. Southern stepped between them, Ms. Fentress saw Mr. Green strike Mr. Southern with his gun. When Mr. Southern and Mr. Brinson ran away, witnesses saw both Mr. Harris and Mr. Green firing their guns, and shell casings found in their respective locations were fired by guns that officers found hidden by an air duct in Mr. Harris's house. Mr. Harris's act of hiding both guns in his basement supports the State's showing that he and Mr. Green were acting together. See *Coleman*, 399 Ill. App. 3d at 1204 (a court may consider acts occurring after a statement is made when determining whether a conspiracy existed when the statement was made). This evidence all supports the trial court's conclusion that Mr. Harris and Mr. Green were acting in concert, and pursuing a common purpose of harming Mr. Southern and Mr. Brinson.

¶ 93     Moreover, Mr. Green made the "blow, Wood, blow" statement during and in furtherance

of the conspiracy where it encouraged Mr. Harris to shoot. *Jaimes*, 2019 IL App (1st) 142736, ¶ 64. Mr. Harris argues that the statement did not further the conspiracy because "Wood" could have referred to "Lenwood," Mr. Brinson's nickname, or one of the other people with guns. This argument is unpersuasive because Mr. Harris immediately stopped running and fired his gun when Mr. Green made the statement.

¶ 94                                    2. Lieutenant Kimble

¶ 95    Next, Mr. Harris challenges the testimony of Lieutenant Kimble. Ms. Crawford testified that a police officer was present when Mr. Southern's family and friends gathered at the church, but she did not remember his name or telling him where Mr. Harris lived or the type of car he drove. Lieutenant Kimble then testified that Ms. Crawford told him at the church that someone named "Dre" or "Jaywood" was involved in Mr. Southern's death, that he lived "toward the end" of the 7100 block of Morgan, and that he drove a silver vehicle. She also "mentioned something about the first letters of the license plate." While we agree with Mr. Harris that this was error, it was harmless error that does not require a new trial.

¶ 96    On appeal, the State argues that the testimony was admissible as course-of-investigation testimony and not used substantively. "The 'course of investigation' doctrine allows admission of statements to the extent necessary to explain steps taken by police in the investigation of a crime." *People v. Rainey*, 2025 IL App (1st) 231769, ¶ 34. Such a statement is not hearsay because it is not offered for the truth of the matter asserted. *Id.* However, where the State uses the statement as substantive evidence in arguments to the jury, the purpose of admitting the statement is altered and it becomes offered for the truth of the matter asserted, making it hearsay. *Id.*

¶ 97    Here, the record shows that Lieutenant Kimble's testimony about Ms. Crawford's statements to him was not offered as course-of-investigation testimony but for the truth of the

26

matter asserted in Ms. Crawford's statements. When defense counsel objected before Lieutenant Kimble testified and explained that the State had indicated to her that it was calling Lieutenant Kimble to prove that Ms. Crawford had given Lieutenant Kimble the information about Mr. Harris, the State did not disagree. Instead, the State argued that, because Ms. Crawford testified she did not remember making the statements, it could "confront [the] witness to whom the statement was made." Then, during closing argument, the State explicitly argued to the jury that Ms. Crawford knew where Mr. Harris lived and the car he drove, and gave that information to the police, and that Mr. Harris was "identified" by that information. Further, Lieutenant Kimble's testimony went beyond the fact that he had a conversation with Ms. Crawford and impermissibly established the content of that conversation. See *People v. Ochoa*, 2017 IL App (1st) 140204, ¶¶ 41, 61 (explaining that an officer may testify that he spoke to a witness but may not disclose the contents of the conversation).

¶ 98     However, the admission of hearsay does not require reversal if the State shows that there is no reasonable probability that the jury would have acquitted the defendant absent the hearsay. *Id.* ¶ 58; *People v. Irwin*, 2017 IL App (1st) 150054, ¶ 26. When considering whether an error was harmless beyond a reasonable doubt, we may "focus on the error to determine whether it might have contributed to the conviction," "examine the other properly admitted evidence to determine whether it overwhelmingly supports the conviction," or "determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence." (Internal quotation marks omitted.) *Irwin*, 2017 IL App (1st) 150054, ¶ 26.

¶ 99     To the extent that Lieutenant Kimble's testimony linked Mr. Harris to the house where the guns were found, that link was also established by the evidence that a bedroom in the house contained mail, a prescription, and an identification card all bearing his name and the house's

address. Further, the other evidence connecting Mr. Harris to the crime was overwhelming given the eyewitness testimony and ballistic evidence. Accordingly, the admission of Lieutenant Kimble's testimony was harmless. *Id.*

¶ 100                                3. Detective Burns

¶ 101    Last, Mr. Harris cites the admission of retired Chicago police detective Andrew Burns's testimony about his interactions with the eyewitnesses. The State called Detective Burns out of order as its first witness due to the detective's schedule, and indicated it would elicit information from him about the police investigation that other witnesses would later explain. The prosecutor asked whether, after speaking to the witnesses of the shooting on September 6, 2015, Detective Burns's investigation "focus[ed] on any individual." Detective Burns answered "Yes," and continued that that person was Mr. Harris. Later, Detective Burns testified that he learned that Mr. Harris had "had contact with" Mr. Green and, after witnesses then viewed Mr. Green in photograph arrays, Mr. Green was arrested.

¶ 102    Mr. Harris argues this testimony was hearsay evidence of the witnesses' statements to Detective Burns. The State argues that this issue is forfeited because Mr. Harris did not object during Detective Burns's testimony or raise the issue in his posttrial motion.

¶ 103    We agree that Mr. Harris has forfeited this issue. A defendant forfeits review of any error if he does not object to the error before the trial court and raise it in a posttrial motion. *People v. Chambliss*, 2026 IL 130585, ¶ 58. This principle encourages the defendant to raise errors contemporaneously so the court can correct them, and prevents him "from obtaining a reversal through inaction." *Id.* As Mr. Harris could have raised this issue below and did not, and has not requested plain-error review or provided any other reason to bypass our well-established principles

of forfeiture, we find this issue forfeited and need not reach its merits.

¶ 104                              IV. CONCLUSION

¶ 105    For the reasons discussed, we affirm Mr. Harris's conviction. The State proved his guilt beyond a reasonable doubt, and the court did not err in denying his motion to suppress evidence, admitting the witnesses' prior statements of identification, or allowing Mr. Green's co-conspirator statement. Mr. Harris forfeited his challenge to Detective Burns's testimony, and the admission of Lieutenant Kimble's testimony was harmless error. We therefore affirm the judgment of the circuit court of Cook County.

¶ 106    Affirmed.